## Case No. 12,355.

### The SARATOGA.

[2 Gall. 164, 6 Hall, Law J. 12.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1814.

SEAMEN—WAGES—CAPTURE—VOYAGE BROKEN UP —RE-ENGAGEMENT—FREIGHT EARNED— QUITTING SHIP.

1. A capture, unless followed by condemnation, does not dissolve the contract for mariners' wages. See Abb. Shipp. (Story's Ed. 1629) pt. 2, c. 4, § 2, note 1, where the cases may be found; Id. (7th London Ed., by Sergeant Shee) pp. 167–181. During the prize proceedings it is suspended, and upon a decree of restoration it revives.

[Cited in Emerson v. Howland, Case No. 4,441; Willard v. Dorr. Id. 17,680; Brown v. Lull, Id. 2,018; Pitman v. Hooper, Id. 11,186; The Ocean Spray, Id. 10,412.]

2. If, pending the voyage, there be an interdiction of commerce with the port of destination, by war or otherwise, and in consequence the voyage is broken up, no wages are due.

[Cited in The Two Catherines, Case No. 14,288; Wells v. Meldrun, Id. 17,402; Bork v. Norton, Id. 1,659; Henop v. Tucker, Id. 6,368.]

3. But if the mariners be subsequently retained by the master to refit and preserve the ship, they are entitled to a reasonable compensation in the nature of wages. Abb. Shipp. (Story's Ed. 1829) pt. 4, c. 2, § 2, note 2; Id. § 5, note 2; Id. pt. 4, c. 3, § 2, note 1.

[Cited in The Niphon's Crew, case No. 10,277.]

[Cited in Wilson v. Borstel, 73 Me. 276.]

[See Adams v. The Sophia, Case No. 65.]

4. If afterwards discharged in a foreign port, the mariners are entitled to the two months' pay provided by the act of congress of February 28, 1803, c. 62, and may recover it, if unpaid, by a suit in the admiralty.

[Cited in Wells v. Meldrun, Case No. 17,402; The Dawn, Id. 3,665; The Niphon's Crew, Id. 10,277; Thompson v. The Oakland, Id. 13,971; Joy v. Allen, Id. 7,552.]

5. At what time, after a capture, seamen may lawfully quit the ship.

6. There are some exceptions to the rule, that, to entitle to wages, freight must be earned.

[Cited in The Two Catherines, Case No. 14,288; Pitman v. Hooper, Id. 11,185; The Niphon's Crew, Id. 10,277.]

[Appeal from the district court of the United States for the district of Massachusetts.]

The libellants shipped, as mariners, on board of the ship Saratoga, on a voyage from Boston for Amelia Island, at and from thence to port or ports in Europe, and at and from thence to her port of discharge in the United States. The ship sailed from Boston in October, 1811, for St. Mary's, where she took in a cargo, and thence proceeded to Portsmouth in England, where her cargo was discharged. The agents of the owners having engaged a cargo on freight, at Londonderry in Ireland for the United States, the ship sailed in bal-

last for that port on the 23d of April, 1812, and, on the 26th of the same month, was captured by the French privateer Espadon, and carried into Roscoff in France for adjudication. Prize proceedings were here instituted against the ship and her hatches sealed, and all the crew, except the mates, who were permitted to remain on board, were sent to Morlaix as prisoners. In August, 1812, the captain came down from Morlaix with all the crew excepting three, and by permission, they were there employed fifteen days in tarring the rigging and other ship's duty, and at the end of that time the crew returned to Morlaix. The ship was restored to the captain by order of the court, and taken possession of by him, on or about the first of January, 1813. On the 4th of the same month, the crew came on board, and went to work graving and painting the ship; and on the 7th of the ensuing February, the ship sailed for Morlaix, and arrived in the roads there on the same day; but did not get up to the town until the 1st of March following. The crew remained and slept on board until about the middle of July, in the same year, doing duty as required by the officers, and then left the ship, with the consent of the captain and the American consul, and sailed in a cartel for the United States. During the time of detention under the prize proceedings, the crew were principally maintained by the French government, and the expense, at the restitution, was made a charge on the ship. The crew, frequently during their residence in France, applied to the captain for their wages and discharge. The captain as often told them, that they might go where they pleased, but he had no money to pay them their wages, and they might, if they pleased, arrest the ship, and he would not oppose them. But they did not choose to leave the ship without payment of their wages, and the captain from time to time permitted them to go on shore and work, whenever they could get employment. He seemed, however, to have exercised his control over them, and declared, that if they worked on board of the cartel before their discharge, their wages would be forfeited. After the discharge of the crew, the Saratoga was finally made a cartel, to carry prisoners to England at a stipulated price; and from England she came with prisoners to the United States, where she arrived on or about the 2d of September, 1813. For this last voyage no compensation had as yet been received. The libellants had been paid their full wages up to the time of the ship's departure from Portsmouth, and now claimed wages from that time to the time of their discharge in France, and, in addition, the two months' pay provided by statute of February 28, 1803, c. 62, § 3, in cases of the discharge of seamen in foreign ports.

Mr. Selfridge, for libellants.

This case is similar in principle to that of Brooks v. Dorr, 2 Mass. 39, and the cases

---

there cited, the ship having been restored, and having returned in safety to the United States. That the capture occasioned the loss of freight is not an objection to the right of the libellants to wages, for (1) the legal presumption is, that the Saratoga, sailing from Portsmouth to Londonderry, would not have been captured by a friendly power, unless for some illegal act, which must have been committed by the owner or master, and by which the seamen ought not to suffer; (2) but, if the capture was wanton and without cause, then compensation is to be looked for from the French government, whose courts will give damages in lieu and in the nature of freight; (3) if compensation should be unjustly refused by the French courts, then it becomes the duty of the government of the United States to furnish a complete indemnity to its citizens, whom it is bound to protect.

Many cases show, that the maxim, "Freight is the mother of wages" must be taken with considerable allowance. The seamen are entitled to their wages in many instances, though no freight be earned, if they stay by the ship and do their duty; as, in this case, if after the arrival of the ship at Londonderry the passengers had refused to go on board; or if, at Amelia Island, she could not have obtained a cargo; and in the cases not unfrequently happening, where ships seek a freight abroad, and in consequence of short crops, or some other cause, obtain none. So in case of wreck, the freight is lost; but the seamen are entitled to wages, if there is enough saved to pay them. Frothingham v. Prince, 3 Mass. Append. 563. And this is not by way of salvage. Seamen can in no case be considered as salvors. See [The Blaireau] 2 Cranch [6 U. S.] 240.

But if the seamen are not entitled to wages for the whole time, they are at least entitled to the two months' pay claimed in the supplemental libel, by virtue of the statute of the United States. Act February 28, 1803, c. 62. The mere capture did not dissolve the contract between the master and mariners. The latter remained attached to the ship, and being voluntarily discharged in a foreign country, the captain was by that act bound to pay three months' wages to the consul or agent of the United States at that port, of which, on their taking passage to return to the United States, they are to have two thirds, and the remainder is to be left as a fund. This sum having been due in France, and not having been paid, the libellants have a right to recover it here.

Mr. Hubbard, for claimant Keating.

(1) The contract for wages is contingent. Abb. Shipp. 507 (444); [Howland v. The Lavinia, Case No. 6,797]; 3 Johns. 154. It is a rule, to which, however it may appear in some few cases to have been controlled, it will be safest for the court to adhere, that if the freight is lost, no wages are earned. To produce the loss of wages, it is not necessary that the ship itself be lost. Whenever the voyage is destroyed, there is no title to wages. Beale v. Thompson, 4 East, 562, 3 Bos. & P. 428; The Friends, 4 C. Rob. Adm. 143; Curling v. Long, 1 Bos. & P. 637. It is true that a temporary suspension will not have this effect, but in all cases the specific voyage, for which the seamen engaged, must be ultimately performed. It was to mitigate this rule, considered as in many instances a hard one, that courts apportioned the voyage, and allowed wages, whenever the ship has arrived at a port in the course of her voyage, and has delivered, or might have delivered, a cargo.

(STORY, Circuit Justice. This is a part of the general rule, and contemporary with it. It results from the general law, by which wages are to be paid, wherever freight might have been earned; the mariners not being affected by any special contract of the owner.)

It is impossible to conceive a stronger case than the present, in which the vessel was captured and detained until a war broke out between her country, and that to which she was bound; thereby rendering it impossible and unlawful for her to proceed thither. No services have been rendered by the seamen, from which any benefit has resulted to the owners.

(2) In case of capture and recapture, the wages of the sailors must contribute to the salvage paid. Abb. Shipp. 508 (444); Beale v. Thompson, 3 Bos. & P. 405. Upon the same principle they must contribute to expenses, when a restoration is obtained by judicial decision. If this position is true, and if the seamen were entitled to wages in France, and to receive them out of the ship, then their proportion of expenses would absorb all their wages; the whole expenses having exceeded the value of the ship in France. The seamen are not to profit by the increased value here, which is not owing to their exertions; they are to be in the same condition, in which they would have been, had the ship been sold in France, in which case the whole would have been consumed.

(3) The seamen have no title to the two months' wages provided by the statute of the United States referred to, that statute being necessarily confined to cases where wages are actually due, and not intended to give them in cases, in which they would not otherwise be recoverable. Nor was this such a voluntary discharge, as is contemplated in the act: the master was compelled to permit the departure of the seamen, in consequence of his want of funds.

Mr. Prescott, on the same side.

Though a blockade is not of itself a cause of abandonment, yet if the vessel be detained by a cause within the policy until a blockade takes place, the voyage is considered as defeated by the original cause of detention, and it is a total loss upon an abandonment. Barker v. Blakes, 9 East, 294; Richardson v. Maine Ins. Co., 6 Mass. 120. So in this case, the ship having been detained by the capture

until the war broke out, the voyage must be considered as defeated by the capture. This is an inequitable attempt of the seamen to throw upon the owners the whole loss incurred in an adventure, in which all were alike embarked. The wages to the time of sailing from Portsmouth have been paid. If no voyage has been performed since that time, no wages are due. The ship sailed on a voyage from Portsmouth to Londonderry, and thence to the United States. If this voyage has been performed, and the seamen have remained by the ship, and done their duty, they are entitled to wages. Otherwise, they are not.

(1) If a ship is captured, and carried in for trial, the seamen are not entitled to wages, unless they remain by the ship to the completion of the voyage. The immediate effect of a capture in regard to the rights and duties of sailors is not perfectly settled, the decisions in some measure conflicting with each other. The general position is, that by capture and carrying into a place of safety all contracts are dissolved. But this perhaps is rather too strong: the contract is only placed in a situation to be dissolved. Ships are often detained, one, two, or three years. The seamen cannot be required to stay longer, than is necessary to give their depositions, and to prepare for the defence of the ship. Lemon v. Walker, 9 Mass. 404. If then the sailors have an option to quit the ship, and determine the contract, the master must have the same. The contract cannot be suspended on one side only. If the seamen may quit, the master may dismiss. Beale v. Thompson, 3 Bos. & P. 405. If the contract be once suspended, and the seaman leaves the ship, it may be revived again by his returning and resuming his duty, and the ship's being finally released. But what has here been done, to revive the contract? In order to do this, the seamen must return, be received, and perform duty to the end of the voyage. From the time of the ship's arrival in France to January, the contract was suspended, and it was in the power of either party to dissolve it. The master's deposition shows that he did dissolve it. After the restoration of the ship, was any thing done to revive the contract? The ship could not perform the voyage intended. The master was the only judge of the propriety of leaving France. To entitle themselves to wages, therefore, the seamen must remain by the ship till the end of the war, or till the master should judge it prudent to leave France, and complete the voyage. But they had an option to leave the ship, and they did so. Nor can they claim wages to the time of their leaving the ship. Had the incapacity, existing at the time of their departure, been afterwards removed, and the voyage performed by the help of a new crew, what was thus done by the services of the new crew could not give the old a title to wages, which they would otherwise have lost.

(2) The voyage being defeated by a vis major, the seamen lose their wages. This results from the general maxim, that "freight is the mother of wages." This is a reasonable provision in itself. It would be a hardship upon the owner to be compelled to pay wages for a voyage, in which he has lost his freight, and which has been broken up by a misfortune, that should be common to all engaged in the adventure. All the cases, that have been supposed on the other side, are where the voyage is performed, and the freight not prevented from being earned by a vis major, but by some other cause. In every case, where the ship arrives and performs her voyage, but from accident or vis major earns no frieght, (as if the cargo be destroyed by tempest,) no wages are due. It is true, that if the seamen by their exertions save the ship, and bring her into port, they are entitled to salvage. This is often, but incorrectly, called wages. Chief Justice Kent's Opinion, 3 Johns. 154; Frothingham v. Prince, 3 Mass. Append. 563. The stipulated wages may be the measure of compensation, but they are not given as wages.

The facts in the case abundantly show, that this voyage was defeated. The ship was captured on her passage for Londonderry, and carried into France. Here was a vis major. When she was liberated, a war had commenced between the United States, and the country to which she was bound. The ship then could not be in a capacity to perform the voyage. And even had she been so; had she been a neutral ship, and the captain willing to go; still the seamen, being Americans, could not lawfully have gone. This case has been compared to the doctrine of insurance, adopted both in England and in this state, that even a war does not, as respects insurers, justify a breaking up of the voyage. But this will not apply to seamen, who have a contract to perform, of which the performance has by war become unlawful. This however is a case of a different kind. The voyage was defeated by an accident out of the control of the master or crew; by capture and detention. The subsequent incapacity, arising from hostilities, must, according to the English cases, be ascribed to the original detention.

(3) Great expenses have been incurred, to effect the liberation of the ship and cargo. For the same reason, that in cases of capture and recapture, the seamen must contribute to the salvage, in the proportion that the sum paid bears to the whole; they must contribute in this case, in which expenses have been incurred for the common benefit, and to prevent a condemnation, which they were interested to prevent. These expenses amounted to the whole value of the vessel in France.

(4) As to the supplemental libel; the intention of the law of the United States, on which it is founded, was to secure sailors against the effects of their own improvidence, as they might often consent to be dis-

charged to their great injury. It is therefore provided, that the master shall pay to the consul three months' wages. It is a thing, over which the seamen have no control. The consul only can claim this sum. There is no contract with the seaman to pay him the two months' wages. This law was also intended to deter the master from selling his vessel, or discharging his sailors, in a foreign port. It cannot apply to a case of necessary discharge, but only to those of a voluntary discharge, not produced by any accident or vis major. Poth. Du Louage des Matelots. Nos. 1·0, 182.

Mr. Selfridge, in reply.

This is a strong case of equity in behalf of the seamen, since their conduct has been faithful. The general policy of the government having been to protect this class of men, and to exercise a sort of guardianship over them, the court will adhere to this policy, whenever no particular objection appears against it.

(1) To the general doctrine, that "freight is the mother of wages," there are exceptions. Suppose, for instance, an American ship, before the war, bound to England and laden with enemy's property, is carried into France and condemned, the freight however being allowed; that while there detained a war takes place between this country and England; the ship then cannot earn a freight home from England, as intended; yet the seamen are entitled to their wages, if the ship returns home in safety. In the case of Frothingham v. Prince, the seamen received their wages out of the remnant of the wreck, after paying the salvors. Admitting that, when the ship was carried into Roscoff, it was, after a reasonable time, at the option of the seamen or master to dissolve the contract, of which it was the duty of the master to inform the seamen; still this has not been done. Many circumstances in the case show, that the master, so far from dismissing the seamen, still required their services, and considered them attached to the ship. He even prohibited their leaving him to go on board an American privateer, or the American cartel. The case of Brooks v. Dorr shows, that a dissolution is not so easily effected between the master and seamen, as between underwriters and insured. There may be a right to abandon, and seamen still have a right to recover their wages.

(2) If the voyage has been broken up or defeated, it was by the fault of the owners. Going from port to port of the enemy's country was the suspicious cause, which induced the capture. Had this been known to the seamen, they would not have gone.

(3) If the seamen would have been entitled to full wages in case of their remaining on board, and performing the voyage, they must, on the same principle, be entitled to wages pro rata to the time of their discharge by mutual consent. At any rate, they are entitled to wages from the 1st of January, when the captain ordered them to go to Morlaix to work, to the time of their discharge.

(4) As to salvage; the seamen are not liable to contribution, in case of a capture or detention by a friendly power, or if the capture be caused by the fault of the owners.

(5) As to the two months' wages claimed by the supplemental libel; the object of the law was, to encourage the return of seamen by a bounty. It is said, there is no contract; but to this it may be answered, that the law itself raises a contract.

STORY, Circuit Justice, (after reciting the facts). The question for the consideration of the court is, whether the libellants are entitled, under all the circumstances of the case, to any wages beyond what they have already received; and if so entitled, for what period wages are to be allowed? It is argued, on behalf of the respondents, that the libellants have no further claim for wages, no freight having been earned, and the voyage having been, by the capture and subsequent declaration of war between Great Britain and the United States, completely broken up and defeated. The general rule is often asserted, that to entitle the seamen to wages, freight should be earned on the specific voyage, for which they engage; and that if, by any disaster happening in the course of the voyage, the owners lose their freight, the seamen also lose their wages. Abb. Shipp. pt. 4, c. 3, § 1; Hoyt v. Wildfire, 3 Johns. 518; Dunnett v. Tomhagen, Id. 154. The reason or policy of the rule is alleged, in 1 Sid. 179, to be, that if, in case of the loss of the ship by tempest, enemies, &c. the mariners were to receive their wages, they would not hazard their lives for the safety of the ship. The rule itself also is not without exceptions; if the voyage or freight be lost by the negligence, fraud or misconduct, of the owner or master, or voluntarily abandoned by them; if the owner have contracted for freight upon terms or contingencies differing from the general rules of maritime law; or if he have chartered his ship to take a freight at a foreign port, and none is to be earned on the outward voyage; in all these cases the mariners are entitled to wages, notwithstanding no freight has accrued. Hoyt v. Wildfire, 3 Johns. 518; Hindman v. Shaw [Case No. 6,514]; Giles v. The Cynthia [Id. 5,424]; Relf v. The Maria [Id. 11,692]; Abb. Shipp. pt. 4, c. 2, § 5; Maylne, 105; Moll. De J. Mar. bk. 2, c. 3, § 7; Moran v. Baudin [Case No. 9,785]; Roccus, De Nav. note 43. Reasonable however as the rule may seem to be, under these limitations, to those who are conversant with the maritime law of England, it does not seem to have obtained the universal sanction of the commercial world, though it has the weight of the authority of Bynkershoek (Quæst. Pub. Jur. c. 13) to support it. Roccus (De Nav. note

43) holds, that wages are due, notwithstanding the voyage is not performed, if it happen from any fortuitous occurrence, and the mariner is not in fault. Cleirac seems silently to adopt the regulations of the ordinance of Philip II. as reasonable (Cleirac, Jugemens d'Oleron, art. 19, § 3), and Pothier considers that maritime contracts, subject to few exceptions connected with the French ordinances, are governed by the same principles as other contracts of hire, and consequently that if, after its commencement, a voyage be defeated by accident, or superior force, the mariners are entitled pro rata for their term of service (Poth. Du Louage des Matelots, 179, etc., 198, 203). See, also, Abb. Shipp. pt. 4, c. 2, § 6.

It has been argued, that the capture put an end to the contract for wages, and therefore that no services, performed afterwards, can entitle the libellants to recover wages upon the footing of that contract. Admitting that capture, followed up by condemnation, would extinguish such contract, still such effect cannot be attributed to a capture, where there has been a recapture or restitution. And notwithstanding some contrariety of opinion, it may be safely affirmed, that such capture operates, at most, but to suspend the contract, and that by restitution or recapture, the parties are remitted to their former rights in the same manner, as if no such interruption had occurred. Beale v. Thompson, 4 East, 546; Brooks v. Dorr, 2 Mass. 39. See Weskett, Ins. tit. "Wages," art. 11.

It has been further argued, that by the capture the relation between the owners and mariners ceases; so that the latter are not bound to remain by the ship, but are at liberty, without the imputation of desertion, to abandon the voyage. Without deciding, whether the rule assumed in some of our own courts be not more reasonable, that the mariners are bound to remain by the ship until a first adjudication (Bordman v. The Elizabeth [Case No. 1,657]. And see Lemon v. Walker, 9 Mass. 404; Weskett, Ins. tit. "Wages," 11; 1 Strange, 405; 1 Term R. 73), it is clear, that the mariner is not bound to leave the ship. He has a right to remain by her, and wait the event. If restored, he is entitled to his wages, if the ship proceed and earn a freight; if condemned, he may lose his wages, though perhaps, under circumstances, with a recompense for his actual services, pending the prize proceedings. And this doctrine seems founded in the interests of all parties. It would, indeed be highly injurious to commerce, to establish, that in every case of capture, upon whatever pretence, or however unfounded, the mariners were obliged immediately, without waiting the event, to quit the ship in a foreign port.[2] It would often expose the owner to a

loss of the voyage, from the difficulty of obtaining a new crew, or to extraordinary expense in securing his property. On the other hand, the mariners would be no less exposed to inconvenience. They might be turned ashore without money or credit, in a foreign country, against the manifest policy of our laws. It would seem fit, therefore, to hold, that a contract entered into by mutual consent should not be dissolved unless by that consent, until such proceedings were had, as left no ordinary hope of recovery in the original tribunal of prize.

Upon the principles, then, which have been stated, the capture did not dissolve the contract for wages; at most, it was but suspended during the prize proceedings, the event of which the parties had a right to await; and by the subsequent restoration of the ship, the contract revived in its full force, and remitted the parties to their former character and rights. If the ship had then been in a condition to perform her voyage, and had actually performed it, there can be no doubt, that they would have been entitled to their full wages during the whole time of service. Beale v. Thompson, 4 East, 546. But at the time of the restoration of the ship, war existed between Great Britain and the United States; and the further prosecution of the voyage was not only impracticable, but highly criminal in both parties. The legal effect, therefore, of such an interdiction of commerce, was to absolve both parties from any further performance of the contract. Abb. Shipp. pt. 3, c. 1, § 3; Scott v. Libby, 2 Johns. 336; The Tutela, 6 C. Rob. Adm. 177. The question then arises, whether a loss of the voyage, in consequence of an interdiction of commerce after its commencement, deprives the owner of his freight or the mariners of their wages?

It seems to be a doctrine of our law, that if a voyage be broken up, by an interdiction of commerce with the port of destination, after its commencement, no freight is payable. And the same rule is applied to cases, where the voyage is lost by accident or superior force. Osgood v. Groning, 2 Camp. 466; Liddard v. Lopes, 10 East, 526; Scott v. Libby, 2 Johns. 336; Abb. Shipp. pt. 3, c. 7, § 5; Id. c. 11, § 3; The Hiram, 3 C. Rob. Adm. 180. In short, the principle seems to be, that there must be an actual delivery of the cargo at the port of destination, to entitle the party to his full freight. Richardson v. Maine Ins. Co., 6 Mass. 102–118. If indeed, there be a

---

[2] In the Ordinances of the Hanseatic Towns, art. 49, we find the following provision in relation to this subject: "If the ship is arrested in a foreign country, or the master is obliged to wait for his freight, or to tarry from any other cause; during all such delay, the seamen shall be nourished as usual, but without having any pretence or demand for extraordinary wages; and if they are entitled to any thing, they shall be paid at the port, where the ship shall discharge, according to the award of experienced men and common friends. But if any seaman shall be so bold, as to abandon the ship upon this pretext, he shall suffer a corporal punishment, according to the exigency of the case."

voluntary acceptance of the cargo at an intermediate port, and a dispensation of proceeding further, then a pro rata freight is due. Luke v. Lyde, 2 Burrows, 883; Liddard v. Lopes, 10 East, 526; Osgood v. Groning, 2 Camp. 466. In these respects our law appears to differ from the maritime law of other countries. Roccus (De Nav. note 54; Id. note 81) declares, that if the ship has begun her voyage, and from accident is prevented from completing it, freight is payable for the part of the voyage actually performed. This also is the opinion of Straccha (De Nav. pt. 3, § 24), and seems, with some distinctions, to be adopted in the maritime regulations of France (Poth. Charte Partie, notes 68, 69; 1 Emer. 544; 1 Valin, Comm. 656). Indeed, in the case of an interdiction of commerce after the voyage is begun, the full freight for the outward voyage is allowed. Emerig, 544; 1 Valin, Comm. 656; Poth. Charte Partie, note 69. If we pass from the consideration of freight to that of wages, we shall find, as I have already stated, that foreign writers do not consider that wages are wholly lost, but recoverable pro rata itineris, where the voyage has been in part performed, and its further accomplishment has been prevented by inevitable casualty or superior force.

As to an interdiction of commerce with the port of destination, occurring in the voyage, Cleirac (Jugemens d'Oleron, art. 19, §§ 3, 4) adopts, with apparent approbation, as conformable to the civil law, the regulation of Philip II., that the mariners shall, in such case, receive a quarter part of the wages agreed upon for the whole voyage (Dig. lib. 19, tit. 2, 1. 15, § 5). The French ordinance (Des Loyers des Matelots, art. 4) declares, that, in the like case, the mariners shall be paid in proportion to the time they have been in service, and this, Pothier says, is conformable with the general rules of the contract of hire (Poth. Du Louage des Matelots, 180; 1 Valin, Comm. 688). No case has been cited, in which this point has been settled in our own courts; and, as far as I have been able to ascertain, after a pretty diligent search, it yet remains for a decision in our maritime law. But if the doctrines already settled in relation to freight are to apply, and it seems impossible to distinguish them, the interdiction of commerce must be deemed to dissolve the contract, and leave the mariner without any title to wages pro rata itineris peracti. Indeed, the moment it is held, that, where freight by the general law is not earned, wages are not due, the case falls directly within the authorities, which have been already examined.

My opinion as to this point, therefore, is, that war existing at the time of the restoration of the ship, and the further prosecution of the voyage being illegal, the original contract was completely dissolved, and up to that time no further wages were due. If the case had rested here, the claim for wages must have been repudiated. But the mariners, with the consent of the master, came on board, and did duty from the time of the restoration of the ship, until their final discharge. It was clearly competent for the master to hire and employ a crew for the preservation and equipment of the ship, and the services so performed cannot, by any reasonable construction, be referred back to a contract, which then had no legal existence. The libellants then must be deemed to have gone on board, and to have done duty, under an implied contract to receive a reasonable recompense, in the nature of wages, pro opere et labore. Upon the footing of this new contract, I have no difficulty in sustaining their claim for wages, during the time of their connexion with the ship after restoration. Full wages, however, ought not to be given for this period, because the services performed or required were not equal to the usual services in the progress of the voyage. In case of detention, under the arrest of a sovereign, the French ordinance (Des Loyers des Matelots, art. 5; Valin, Comm. 6, 190) provides, that the mariners hired by the month, shall be entitled to a moiety only of their wages during such detention. Under all the circumstances of this case, I shall adopt this as an equitable rule, and shall decree wages accordingly.

The next question that arises is, whether the libellants are entitled to the two months pay under the act of the 28th of February, 1803, c. 62? The third section provides, that whenever an American ship shall be sold in a foreign country, or an American seaman shall, with his own consent, be discharged in a foreign country, the master of the ship shall pay to the commercial agent of the United States, for every seaman so discharged, three months' pay, over and above the wages due to such seaman, two thirds thereof to be paid to such seaman on his engagement on board of any vessel to return to the United States, and the remaining third to be retained for a fund to relieve destitute American seamen. I agree with the counsel for the respondents, that the cases here alluded to are cases of voluntary discharge, and not cases, where the discharge has resulted from inevitable necessity or superior force, such as a total loss by capture, tempest, or other fortuitous occurrence. But I can, by no means, admit, that the present case comes within the exception. The ship was in a capacity to return home, or perform any lawful voyage, and, at the time of the discharge, the libellants were attached to her service. The case falls, therefore, within the words and the mischiefs of the statute; and though the money is required to be paid into the hands of a public agent for the use of the libellants, yet as they did all the acts, which gave them a perfect title to it, and it was not paid, this court will enforce their title directly against those, who were circuitously compellable to pay it. The two months' wages, however, are to be calculated, not on the

original wages; but on the wages growing out of the new contract of hire.

Before I close this opinion, I will advert to one or two considerations, which have been thrown out in the argument. It has been argued, that if the seamen were entitled to wages, they were bound to contribute towards the expenses of procuring the release of the ship, as a general average. But I know of no rule of law, which subjects the seamen to contribution in such a case. The general doctrine is, that they do not contribute to general average. The only admitted exception is in case of ransom, and, perhaps, by parity of reasoning, of recapture. Abb. Shipp. pt. 3, c. 8, § 14; Id. pt. 4, c. 3, § 2; The Friends, 4 C. Rob. Adm. 143; 1 Emer. 642; 1 Valin, Comm. 752, 701. If the doctrine were otherwise, it would not apply to the present case; for the wages to contribute must be those, which are saved by the expenses incurred; and not the wages accruing under another contract. Here the very subject matter for contribution was totally lost. It has been argued, on the other side, that a capture of a neutral by a belligerent differs from capture by an enemy as to its effects; that it either affords prima facie evidence of illegal conduct in the neutral, which subjects him to condemnation, and such conduct ought not to affect seamen, who are innocent parties; or such capture is wrongful, and the owners are entitled to damages equivalent to the freight. It might be a sufficient answer to this argument, that no such distinction, as to legal effects, has as yet been recognised; and so far as authorities proceed, they indiscriminately apply to neutral, as well as enemy's captures; and further, that if the voyage be not performed, and freight be not in fact allowed, by way of damages, upon restitution, which may arise without any default of the owner, he would be compelled to pay wages, where the general law had, as a case of the vis major, exempted him. The case also of Frothingham v. Prince, 3 Mass. 563 (same case cited 2 Dane, Abr. c. 57, § 3, p. 462), has been pressed upon the court, as a direct authority to prove, that the payment of wages does not depend upon the earning of freight, if the ship, or any of her materials equal to the wages, remain after the voyage. That case is very imperfectly reported. I have, however, examined the original record, and from a memorandum on it, I find the full wages for the homeward voyage were allowed, although the cargo was totally lost by shipwreck, and the ship herself was so much injured, that the materials sold for little more than the wages. No reasons are given for this decision, and, perhaps, it may have turned, as the defendant's counsel have suggested, upon the ground, that under the circumstances, the seamen were entitled to a salvage equal to their wages. Coffin v. Storer, 5 Mass. 252; Abb. Shipp. pt. 4, c. 2, § 6. If, however, it be incapable of this explanation, as I confess, from the examination of the record, I think may admit of question, the most that can be said is, that it is a single case standing alone against the current of authority. Decree of the district court reversed.

See The Two Catherines [Case No. 14,288]. See, also, The Neptune, 1 Hagg. Adm. 227.